**UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| R. DAVID YOST, | |
| Plaintiff, | |
| v. | |
| MORGAN TIMOTHY CARROLL, | Civil Action No. 1:20-cv-5393 |
| Defendant. | |
| | Magistrate Judge Jeffrey Cole |
| MORGAN TIMOTHY CARROLL, | |
| Counter-Plaintiff/ Third Party Plaintiff, | |
| v. | |
| R. DAVID YOST, AND ANNE YOST CARROLL, | |
| Counter-Defendant and Third-Party Defendant. | |

**DEFENDANT MORGAN CAROLL'S RULE 56.1(a) STATEMENT OF UNDISPUTED
MATERIAL FACTS IN SUPPORT OF SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1(a), Defendant Morgan Timothy Carroll ("Carroll")
respectfully submits this Statement of Material Facts as to which there is no genuine issue in
support of his Motion for Summary Judgment.

**A.     The Parties**

1.      Plaintiff R. David Yost ("Yost") is a citizen of the State of Pennsylvania. (**Ex. 1**,
Complaint ("Compl."), Dkt. 001, p. 1 at ¶ 3.)

1

2.      Carroll is a citizen of Illinois. (Ex. 1,  p. 1, ¶ 4; **Ex. 2**, Carroll's First Answer and Affirmative Defenses ("<u>Answer</u>"), Dkt. 027, p. 2, ¶ 4.)

3.      Anne Yost Carroll ("<u>Anne</u>") is the plaintiff Yost's daughter. (**Ex. 3**, Transcript of Deposition of R. David Yost ("<u>Yost Tr</u>."), at 24:17-19.)

4.      Anne is Carroll's spouse. (Ex. 3 (Yost Tr.) at 65:6-12.)

**B.      Jurisdiction and Venue**

5.      This court has diversity jurisdiction under 28 U.S.C. §1332. (*See* ¶¶ 1-2 above).[1]

6.      Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial portion, if not all, of the events giving rise to the claim against Carroll occurred in this district. (Ex. 1, p. 2, ¶ 6.)

**C.      Yost's Gifting and Note Scheme In General**

7.      Between 2003 and 2016, Yost gave to his daughter, Anne, and his son-in-law, Carroll, $7,475,000.00 to purchase various homes (the "<u>Yost Gifts</u>") (**Ex. 3** (Yost. Tr.) at 61:6-63:23, 66:12-71:19, 99:11-23, 103:2-21.)

8.      At the time he provided the Yost Gifts, Yost was aware that there was a federal gift tax on gifts over a certain amount. (Ex. 3 (Yost. Tr.) at 17:24-19:1.)

9.       At the time he provided the Yost Gifts, Yost was aware that a donor must file a gift tax return each time he or she makes a gift above exemption amount. (Ex. 3 (Yost. Tr.) at 19:2-13, 165:24-166:12.)

---

[1] The third-party claim against Anne, a resident of the same state as Carroll, does not destroy diversity jurisdiction. This Court may exercise ancillary (now a part of what is called "supplemental") jurisdiction over that claim even though it could not be litigated in federal court were it not for their relation to Yost's claim against Carroll. *See* 28 U.S.C. § 1367(a); *Aurora Loan Services, Inc. v. Craddieth*, 442 F.3d 1018, 1024 (7th Cir. 2006); *Sarkis' Café, Inc. v. Sarks in the Park, LLC*, 55 F. Supp 3d 1034, 1042 (N.D. Ill. 2014); *Ruderman v. Bank of Am., N.A.*, 2012 WL 4795705, at *2 (N.D. Ill. Oct. 9, 2012).

10.     The Yost Gifts to Anne and Carroll exceeded the annual gift tax exemption in each of the years the gifts were made. (Ex. 3 (Yost. Tr.) at 18:12-19:1; **Ex. 4** (2003 Instructions for Form 709), p. 3; (**Ex. 5** (2009 Instructions for Form 709), p. 2; **Ex. 6** (2015 Instructions for Form 709), p. 3; **Ex. 7** (2016 Instructions for Form 709), p. 3).

11.     Yost did not file gift tax returns for the Yost Gifts. (Ex. 3 (Yost. Tr.) at 166:13-22.)

12.     Instead, Yost asked Anne and Carroll sign promissory notes (collectively, the "Notes"). (Ex. 3 (Yost. Tr.) at 61:6-62:16, 67:9-71:10, 99:11-100:11, 101:13-103:6.)

13.     The purpose of the Notes was so that "no gift taxes would be incurred" and as a "formality [that] may be necessary in a tax audit." (**Ex. 8** (Defendant's Deposition Exhibit "*Dep. Ex.*" 1)[2] (email from Yost to Anne and Carroll referencing 2009 and 2015 Notes); Ex. 3 (Yost. Tr.) at 23:23-24:11 (authenticating Ex. 8); *see also*: **Ex. 9**, (*Dep. Ex. 3*) (email from Yost referencing 2009 and 2015 Notes); Ex. 3 (Yost Tr.) at 41:19-43:10 (authenticating Ex. 9); **Ex. 10** (*Dep. Ex. 4*) (2016 email from Yost to Anne and Carroll; Ex. 3 (Yost Tr.) at 55:22- 57:8 (authenticating Ex. 10); **Ex. 11** (*Dep. Ex. 5*) (2003 handwritten note from Yost to Anne with promissory note attached; Ex. 3 (Yost Tr.) at 61:6-22 (authenticating Ex. 11).)

14.     According to Yost, the ***Notes were "essential so that the money provided is NOT considered a gift, taxable at 40%***. (Ex. 10 (all caps in original, other emphasis added).)

15.     Yost's intent at the time he had Anne and Carroll execute the Notes was "***that the notes would be forgiven . . . that is the notes would be forgiven to Anne and Morgan***." (Ex. 3 (Yost Tr.) at 29:9-30:3 (emphasis added); *see also* Ex. 8 (*Dep. Ex. 1*) (referring to Yost's intent when the 2009 notes were signed and in proposing a consolidated 2015 note); Ex. 9 (*Dep. Ex. 3*)

---

[2] Carroll labeled his deposition exhibits as "Defendant's Exhibits" and used the same exhibits, sequentially, at all depositions.  The deposition exhibit number is provided to ease the Court's ability to discern where the summary judgment exhibit (with a different number) was discussed and authenticated in the deposition transcripts.

(same); Ex. 3 (Yost. Tr.) at 34:23-36:15 (Yost's intent was to forgive all notes at his death), 58:2-9 (discussing the 2016 Note).)

16.     Specifically, "at the time of his death", it was Yost's "intent at that time [that the] notes[,] including interest[,] would be rolled forward and that . . . they would be declared gifts." (Ex. 3 (Yost Tr.) at 58:2-19 and 30:9-31; Exs. 8-10 (Yost emails discussing "daughter real estate parity."))

17.     To this end, Yost had a provision in his estate plan dictating that the Notes would be forgiven at his death. (Ex. 3 (Yost Tr.) at 58:20-23.)

18.     Yost never considered his daughter's or Carroll's ability to service the notes because he did not "think it was relevant" as his intent was that "the notes would be forgiven at his death, so Anne and Morgan would never have to make any payments on the debt." (Ex. 3 (Yost Tr.) at 76:15-77:2 (discussing the 2009 Notes that were rolled into the 2015 Note) and 103:16-104:3 (discussing the 2016 Note).)

19.     The Notes (and other notes executed by Anne's sisters) were also a way to track amounts gifted to each child so that there could be a "true-up" at Yost's death whereby the daughters who received less during Yost's lifetime would receive a greater share of his estate at his death. (Ex. 3 (Yost Tr.) at 30:4-31:2, 36:10-37:2, 45:15-46:6; Exs. 8-10 (Yost emails referencing daughter gift parity).)

20.     In February 2013, Yost hosted a "Yost Family Meeting", with presentations by financial, estate, and tax planning advisors, and at which there was a formal presentation of Yost's already ongoing scheme to provide funds to his daughters and their husbands to purchase homes. (**Ex. 12**, (Yost Family Meeting Agenda) (*Dep. Ex. 2*); Ex. 3 (Yost Tr.) at 39:3-11 (authenticating Ex. 12) and 41:2-13).)

4

21.     On January 1, 2014, Yost reiterated his donative intent in an email to Anne and his other daughters with the subject line "The Financial Joy of Being a Yost", which provided a summary for "remembering and using the amazing financial blessings that Mom and I have received, and wholeheartedly, with deep love, pass on to you" a bulleted list which included, as its final item, "*Money saved by mortgages with the Bank of Yost*." (**Ex. 13**, Email from Yost to Anne dated January 1, 2014 (Ex. 12 to Carroll Dep); **Ex. 14**, Transcript of Deposition of Morgan Carroll ("Carroll Tr.") at 96:3-19).)

22.     In line with Yost's stated intent, Anne and Morgan did not consider the Yost Gifts to be loans. (Ex. 14 (Carroll Tr.) at 172:2-18; **Ex. 15** (Transcript of Deposition of Anne Carroll ("Anne Tr.") at 18:5-9, 60:22-61:7.)

23.     Until this lawsuit, Yost never demanded payment on the Notes and never collected interest. (Ex. 3 (Yost Tr.) at 77:7-11, 101:5-7, 133:19-134:6.)

24.     Upon Anne's decision to divorce Carroll, Anne's divorce attorneys suggested that Yost leverage the Notes in the divorce action. (**Ex. 16** (*Dep. Ex. 18*) (2020 email exchange between Yost and Genevieve McCormack), p. 2; Ex. 3 (Yost Tr.) at 134:22-135:6 (authenticating Ex. 16).)

**D.     The 2003 Gift and Note**

25.     In 2003, Anne asked Yost for money to help her purchase an apartment on 16th Street in New York City (the "16th Street Apartment"). (Ex. 15 (Anne Tr.) at 18:17-20.)

26.     Yost gave Anne $475,000.00 to purchase the 16th Street Apartment. (Ex. 11 (*Dep. Ex. 5*) (Yost handwritten note to Anne with 2003 Note Attached); Ex. 3 (Yost Tr.) at 61:6-22 (authenticating Ex. 11).)

5

27.    On July 1, 2003, Yost presented Anne with a $475,000 promissory note (the "2003 Note") so "that the money provided for your apartment does not count as a gift, for which gift taxes have to be paid." (Ex. 11 (2003 Note attached to Yost handwritten note).)

28.    The 2003 Note provided for interest to accrue at 6%, with no payments being due until June 20, 2008, after which Anne was to begin monthly payments, with the entire balance being payable on demand after June 20, 2008. (Ex. 11 (2003 Note), p. 2.)

29.    Anne did not believe she had to pay the 2003 Note back. (Ex. 15 (Anne Tr.) at 18:5-9.)

30.    Yost's intent, at the time he had Anne execute the 2003 Note (the "original note") was "***that the notes would be forgiven at . . . [his] . . . death*** … (Ex. 3 (Yost Tr.) at 29:22-30:3 (emphasis added).)

31.    Anne did not start making payments on the 2003 Note as of June 30, 2008. (Ex. 3 (Yost Tr.) at 64:22-65:1.)

32.    Yost did not make any demand for payment on the 2003 Note. (Ex. 3 (Yost Tr.) at 64:19-21.)

**E.    The 2009 Gift and Notes**

33.    On March 12, 2009, Yost gave Anne and Carroll $2.5 million to help them purchase and renovate an apartment at 60 Gramercy Park in New York City. (Ex. 3 (Yost Tr.) at 70:18-71:19; **Ex. 17** (*Dep. Ex. 9*) (handwritten notes by Yost); Ex. 3 (Yost Tr.) at 78:7-79:4 (authenticating Ex. 17); **Ex. 18** (*Dep. Ex. 10*) (email from Anne to Yost); (Ex. 12 (Anne Tr.) at 27:24-29:20 (authenticating Ex. 18).)

34.    On April 30, 2009, Anne and Carroll executed three promissory notes in favor of Yost dated April 30, 2009: one in the original principal amount of $500,000; one in the principal

6

amount of $1,500,000; and third in the principal amount of $1,000,000 (the "2009 Notes"). (**Ex. 19** (*Dep. Ex. 6*); **Ex. 20** (*Dep. Ex. 7*); **Ex. 21**, (*Dep. Ex. 8*); Ex. 3 (Yost Tr.) at 69:7-70:17 (authenticating the 2009 Notes).)

35.     The note for $500,000 was a replacement of the 2003 Note. (Ex 3 (Yost Tr.) 70:8-17; Ex. 19.)

36.     The notes for $1.5 million and $1.0 million reflected the $2.5 million advanced by Yost for the Gramercy Park Apartment. (Exs. 20-21 (notes); Ex. 12 (Anne Tr.) at 29:14-17; Ex. 3 (Yost Tr.) at 69:7-71:19, 78:7-79:4 (authenticating and referencing notes).)

37.     The purpose of the 2009 Notes was so that no gift taxes would be incurred; to "prove to the IRS that the money provided was not a gift, subject to gift tax of 45% . . ." (Ex. 8 (email discussing rollover of 2009 Notes into one Note, the 2015 Note); Ex. 3 (Yost. Tr.) at 23:23-24:11 (authenticating Ex. 8 (*Dep. Ex. 1*); Ex. 9 (2015 email discussing the 2015 Note and the 2009 Notes); Ex. 3 (Yost Tr.) at 41:19-43:10 (authenticating Ex. 9 (*Dep. Ex. 3*).)

38.     Yost's intent at the time he had Anne and Carroll execute the 2009 Notes was "***that the notes would be forgiven at . . . [his] . . . death …. that is the notes would be forgiven to Anne and Morgan*** . . ." (Ex. 8 (*Dep. Ex. 1*) (email with 2009 Notes attached); Ex. 3 (Yost Tr.) at 29:9-30:3 (emphasis added) and 32:18-21 (clarifying that the email and his testimony were referring to, among other things, the "original" 2003 Note and the 2009 Notes).)

39.     The 2009 Notes were also intended to create "daughter real estate parity", with Yost's daughters who received less during his lifetime (as tracked by notes) "getting the difference in cash" at Yost's death. (Ex. 3 (Yost Tr.) at 58:2-19 and 30:9-31; Exs. 8-10 (Yost emails discussing daughter real estate parity).)

40.     Under the terms of the 2009 Notes, payments in the amount of $15,000 a month were to commence on April 30, 2014. (Exs. 19-21, p. 1 of each.)

41.     Yost did not consider Anne's and Carroll's ability to service the 2009 Notes because he did not "think it was relevant" since his intent was that the Notes would be forgiven at his death, so Anne and Carroll would never have to make any payments on the debt. (Ex. 3 (Yost Tr.) at 76:15-77:2.)

42.     Anne and Carroll did not start payments on the 2009 Notes on April 30, 2014. (Ex. 3 (Yost Tr.) at 77:3-6.)

43.     Yost never demanded payment from Anne or Carroll on the 2009 Notes. (Ex. 3 (Yost Tr.) at 77:7-11.)

44.     According to Yost, the 2009 Notes were a "formality [that] may be necessary in a tax audit." (Ex. 8; Ex. 3 (Yost Tr.) at 33:3-20 (discussing Ex. 9).)

45.     It was "very important" to Yost that "[he] . . . have documentation so that if . . . [he] . . . had an audit by the IRS, . . . [he] . . . could substantiate that the monies Anne and Morgan received were in fact notes and not gifts." (Ex. 3 (Yost Tr.) at 33:14-20 (discussing Ex. 9).)

46.     On May 24, 2012, Anne executed a Uniform Residential Loan Application, which, under penalty of perjury, did not list the 2009 Notes as liabilities. (**Ex. 22** (Declaration of Morgan T. Carroll and Ex. 22-A, attached Uniform Residential Loan Application).)

## F.      2015 Note – Consolidation of the 2009 Notes

47.     On or about April 30, 2015, Anne and Carroll executed a promissory note in favor of Yost in the principal amount of $2,530,600 (the "2015 Note").  (**Ex. 23** (*Dep. Ex. 13*) (the 2015 Note); Ex. 3 (Yost Tr.) at 99:14-20 (authenticating the 2015 Note).)

48.     The 2015 Note was a consolidation of the 2009 Notes. (Ex. 9; Ex. 3 (Yost Tr.) at 99:20-100:15 (referring to the rollover of 2009 Notes into one note).)

49.     In connection with the 2015 Note, Yost reiterated the purpose of the 2015 Note (like the 2009 Notes consolidated into the note) was so that no gift taxes would be incurred; it was a "formality [that] may be necessary in a tax audit." (**Ex. 8** (*Dep. Ex. 1*) (email discussing rollover of 2009 Notes into one Note, the 2015 Note); Ex. 3 (Yost. Tr.) at 23:23-24:11 (authenticating Ex. 8); Ex. 9 (*Dep. Ex. 3*) (2015 email discussing the 2015 Note and the 2009 Notes); Ex. 3 (Yost. Tr.) at 41:19-43:10.)

50.     Once again, Yost's email reiterated that "***it was my intent when I did the original note and it was my intent when I wrote this memo that the notes would be forgiven . . . that the notes would be forgiven to Annie and Morgan . . .***" (Ex. 3 (Yost Tr.) at 29:9-30:3 (discussing Ex. 8 (*Dep. Ex. 1*) and his intent at the time of 2015 note consolidation).)

51.     The 2015 Note was also part of Yost's way of tracking amounts gifted to each child to maintain daughter gifting parity. (Ex. 3 (Yost Tr.) at 30:4-31:2, 36:10-37:2, 45:15-46:6; Exs. 8-9 (Yost emails referencing daughter gift parity in context of rollover of 2009 Notes into 2015 Note).)

52.     Under the terms of the 2015 Note, interest would accrue at 4% per year and no payments would be made until April 30, 2020, at which time, Anne and Carroll would have to start making payments of $5,000 each month until the note was paid in full. (Ex. 23.)

53.     Anne and Carroll did not start making payments on the 2015 Note after April 30, 2020. (Ex. 3 (Yost Tr.) at 101:2-4.)

54.     Yost never demanded payment from Anne or Carroll on the 2015 Note. (Ex. 3 (Yost Tr.) at 101:5-7.)

G.    **The 2016 Note**

55.    Before September 30, 2016, Yost decided he wanted to financially support Anne and Carroll's purchase of a house located on Sedgwick Avenue in Chicago ("Sedgwick"). (Ex. 10 (October 23, 2016 email from Yost referencing down payment for Sedgwick wired to Anne and Carroll).)

56.    At that time, Anne and Carroll owned but had not sold a property located on Hudson Avenue in Chicago ("Hudson").  (Ex. 3 (Yost Tr.) at 103:2-15.)

57.    Yost advanced Anne and Carroll $4.5 million to help them purchase Sedgwick. (Ex. 3 (Yost Tr.) at 101:13-103:6.)

58.    On November 15, 2016, Anne and Carroll signed another note in favor of Yost in the principal amount of $4,500,000 to document the funds given to purchase and renovate Sedgwick (the "2016 Note"). (**Ex. 24** (*Dep. Ex. 14*) (the 2016 Note); Ex. 3 (Yost Tr.) at 101:13-102:1 (authenticating Ex. 24).)

59.    Once again, Yost reiterated that it was his "***intent at that time [that the] notes[,] including interest would be rolled forward and that . . . they would be declared gifts . . . [and] . . . and the daughters would have their properties*** . . . ." (Ex. 3 (Yost Tr.) at 58:2-9 (discussing the 2016 Note); *see also* Ex. 10 (*Dep. Ex. 4*); Ex. 3 (Yost Tr.) at 56:11- 57:8 (authenticating Ex. 10).)

60.    Again, Yost reiterated that the Notes, including the 2016 Note, were "essential" so that the money provided not be considered a gift, taxable at 40%. (Ex. 10 (*Dep. Ex. 4*); Ex. 3 (Yost Tr.) at 56:11-57:8 (authenticating Ex. 10).)

61.    Yost also reiterated that a balance of $4 million, and not $4.5 million, would be used for "daughter real estate parity calculations" in the event of his death. (Ex. 10.)

62.     The terms of the 2016 Note called for payments to commence on April 30th, 2020, at which time Anne and Carroll were to commence making installment payments of $5,000 a month. (Ex. 24; Ex. 3 (Yost Tr.) at 100:16-101:1.)

63.     At the time Yost gave the funds to purchase and renovate Sedgwick and have Anne and Carroll execute the 2016 Note, Yost did not consider Anne's and Carroll's ability service the note. (Ex. 3 (Yost Tr.) at 103:22-104:3.)

64.     Anne and Carroll did not begin making payments under this note on April 30, 2020. (Ex. 3 (Yost Tr.) at 102:12-15.)

65.     Yost did not make a demand on the 2016 Note when Anne and Carroll failed to start making payments on April 30, 2020.  (Ex. 3 (Yost Tr.) at 102:12-15.)

**H.     Marital Difficulties and Divorce Counsel Advise Enforcing the Notes[3]**

66.     No later than March 6, 2019, Yost became aware that Anne and Carroll were having difficulties in their marriage. (**Ex. 25**, Email from Yost to Carroll dated March 6, 2019 (*Dep. Ex. 15*); Ex. 12 (Anne Tr.) at 77:6-9; Ex. 3 (Yost Tr.) at 104:22-105:13 (authenticating Ex. 25 and discussing marital problems).)

67.     Yost was aware that Carroll had moved out of the marital residence. (Ex. 3 (Yost Tr.) at 105:22-106:9.)

68.     As of July 28, 2019, Anne and Carroll owned both Hudson and Sedgwick but rented out Hudson at a monthly rental rate of $18,000 a month.  On or about that date, Anne and Carroll agreed to pay to Yost the rent received from Hudson, thereby reducing the amounts gifted and

---

[3] The facts in this section are not material to the disposition of Carroll's Illegality defense but are recited to provide a complete picture of when and why Yost decided to enforce the Notes. The only material facts are those relating to Yost's intent, and what he related to Anne and Carroll (and others) regarding his intent at the time he received each of the Notes.

"keeping things 'even' among the sisters." (**Ex. 26** (*Dep. Ex. 16*); Ex. 3 (Yost Tr.) at 108:24-110:20 (authenticating and discussing Ex. 26); Ex. 9.)

69.     No later than September 4, 2019, Anne began inquiring whether "the most recent promissory note [was] signed by both myself AND Morgan?" (**Ex. 27** (*Dep. Ex. 17*) (emphasis in the original); Ex. 15 (Anne Tr.) at 81:9-24 (authenticating Ex. 27).)

70.     On January 6, 2020, Anne informed Carroll that she was going to file for divorce from Carroll. (Ex. 15 (Anne Tr.) at 84:14-20; Ex. 14 (Carroll Tr.) at 226:9-14.)

71.     Anne engaged the firm of Berger Schatz to represent her in the divorce. (Ex. 15 (Anne Tr.) at 85:3-8.)

72.     Yost engaged in discussions with Anne's divorce attorney (a Jason Adess of Berger Schatz) about this case and the Notes.  (Ex. 3 (Yost Dep.) at 115:21-118:22.)

73.     Before February 28, 2020, Anne's divorce counsel (Mr. Adess) advised Yost to "secure" the two remaining Notes – the 2015 Note and 2016 Note. (Ex. 16 (*Dep. Ex. 18*) (2020 email exchange between Yost and Genevieve McCormack), p. 2; Ex. 3 (Yost Tr.) at 134:22-135:6 (authenticating Ex. 16), 121:7-11 (the Notes were unsecured).)

74.     On February 28, 2022, Yost emailed Genevieve McCormack (an attorney) to relay Mr. Adess' suggestion regarding the Notes and seeking a consultation from Ms. McCormack. (Ex. 16, pp. 1-2; Ex. 3 (Yost Tr.) at 122:13-15.)

75.     On February 28, 2020, Yost and Ms. McCormack discussed how to best address the Notes in the context of the divorce action and impending "mediation proceedings" in the divorce. (Ex. 16, p. 1, ¶ 4.)

76.     Ms. McCormack responded to Yost's email, and queries in an intervening call, and advised Yost that he should make a demand for payment through an attorney other "Annie's

divorce lawyer . . . because you want to 100% ensure that the notes are treated by the mediator as a marital debt to a third-party payor." (*Id*. at p. 1, ¶¶ 2, 4.)[4]

77.     Starting in Spring 2020, Anne and Carroll engaged in "ongoing" mediation proceedings relating to the divorce. (Ex. 15 (Anne Tr.) at 93:6-18.)

78.     On June 16, 2020, Anne filed an action for dissolution of marriage in the Circuit Court of Cook County, Illinois. (**Ex. 28** (Petition for Dissolution of Marriage.)

79.     On August 28, 2020, Yost sent correspondences to Carroll demanding payment of the outstanding "notes." (**Exs. 29-30** (demand letters); Ex. 3 at 129:12-131:16 (authenticating Exs. 30-31).)

80.     On November 29, 2021, Anne listed the Notes as liabilities on her Financial Affidavit in the divorce proceedings. (**Ex. 31** (Financial Affidavit), p 7.)

---

[4] Ms. McCormack's response reveals that, in the interim between the two emails, she and Yost had discussed the divorce and Anne's divorce lawyer's ideas about the Notes. Indeed, Ms. McCormack is responding in detail to points not raised in Yost's initial email inquiry. Namely, advice on how to cast the Notes as "marital debt" in the divorce. It is clear that Anne's lawyer advised Yost (who is not his client) has suggested leveraging the Notes in the divorce. (Ex. 16 ("Annie's lawyer has suggested").) Ms. McCormack is then responding to a suggestion that "Annie's divorce lawyer" make a demand under the Notes. (Ex. 16, p. 1, ¶ 4 (advising against that to assure the notes are "treated as a marital debt to a third party.")  Divorce counsel's apparent advice is believed to be a standard leverage play in divorce cases; and a tactic that appears to escape scrutiny in the domestic relations division. Specifically, under the ruse that a sham notes is a legitimate "debt to a third-party[,]" one party (here, Anne) argues that a portion of the marital estate must be used to re-pay the obligation to the payor-insider (here, Yost). If the plan succeeds, the insider, of course, re-gifts the "repayment" back to his child. This effectively gives that party a greater share of the marital estate.  Here, Yost and Anne attempt to use the Notes to garner for Anne 100% of Anne's and Carroll's equity in real estate.

Dated: September 1, 2022

Respectfully submitted,

Morgan Timothy Carroll

*/s/ John E. Zummo*

Aharon S. Kaye (#6291684)
John E. Zummo (#6239693)
GUTNICKI LLP
(847) 745-6292
akaye@gutnicki.com
jzummo@gutnicki.com